**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) CR-N-04-30033-MAP |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) |
| | ) |
| **ARTHUR SOTIRION,** | ) |
| | ) |
| **Defendant.** | ) |

**GOVERNMENT'S SENTENCING MEMORANDUM FOR**
**DEFENDANT ARTHUR SOTIRION**

The United States of America, by and through Michael J. Sullivan, United States Attorney for the District of Massachusetts, and Steven H. Breslow, Assistant United States Attorney, hereby files the Government's Sentencing Memorandum For Defendant Arthur Sotirion.

The government respectfully submits that the defendant warrants the maximum Guidelines sentence of 168 months and the maximum statutory fine of $600,000.00. The defendant's request for a downward departure or non-Guidelines sentence based on his claimed "unique family circumstances" and "decreased likelihood of recidivism" should be rejected as baseless. See Defendant Arthur Sotirion's Motion For Variance From The United States Sentencing Guidelines, Motion For Downward Departure, And Sentencing Memorandum In Support ("Defendant's Sentencing Memorandum") (Docket No. 379).

1

I.    <u>Background</u>

    A.    <u>The Defendant's Offense Conduct</u>

As set forth in far greater detail in the Pre-Sentence Report dated November 9, 2006 and revised January 29, 2007 (the "PSR"), the defendant, along with Raymond Asselin, Sr., masterminded a vast and damaging series of crimes centered around their corrupt operation of the Springfield Housing Authority (the "SHA").   As the SHA's Director and Assistant Executive Director, Asselin, Sr. and the defendant looted the SHA through a longtime pattern of bribery, theft, and fraud.

In particular, the defendant pleaded guilty to the following charges in the Second Superseding Indictment (the "Indictment"): racketeering, in violation of 18 U.S.C. § 1962(c) (Count 1); conspiracy to commit racketeering, in violation of 18 U.S.C. § 1962(d) (Count 2); and filing a false income tax return, in violation of 26 U.S.C. § 7206(1) (Count 114).

<u>Counts 1 and 2</u>.   In connection with the substantive racketeering and racketeering conspiracy charged in Counts 1 and 2, the defendant masterminded the corrupt operation of the SHA as a criminal enterprise.  As a principal architect with Asselin, Sr. of these crimes, the defendant "organized, managed, and supervised, at a minimum, the following individuals:  Baribeau, Katsounakis, Davis, Spano, Bannick, Pappas, Rizollo, Ware, Bates, Maroney, DeCaro, and others."  PSR ¶ 282.

In addition, the defendant directed his staff, including Virma Santiago and Betsy Torres, "to falsify SHA records so that it always appeared that SHA performed at an exceptional level. The net effect of this was that HUD exercised less oversight and ordered fewer audits than they ordinarily would have." PSR § 32. The defendant also directed Santiago and Torres to obstruct justice by downloading their computer hard drives onto hard discs, erasing their hard drives, and secreting the discs at their homes. PSR ¶ 260.

The defendant's duties at SHA included "oversight over procurement and direct supervision of the operation and maintenance of SHA's housing projects." PSR ¶ 32. Indeed, the defendant's official position enabled him, if anything, to have an equivalent if not a greater role in the criminal offense than even Asselin, Sr.

As SHA's Chief Financial Officer Debra Barton testified at the trial of Peter Davis, it was the defendant's responsibility to supervise the contracting process; run the bidding process; supervise the construction process after a contractor was selected; ensure that the work was done as the contractor claimed in the contractor's bills; authorize the contractor's payments; and supervise the procurement and purchase of large items for SHA. Testimony of Debra Barton, Transcript of Proceedings ("T.") at 575-76.

As a result, the defendant was perfectly situated to lead the racketeering and deal with most of the subservient co-conspirators,

including the corrupt contractors and other corrupt SHA employees. Thus, it was the defendant who:

1.  recruited corrupt contractors like Baribeau, Katsounakis, Ware, Bates, and others, e.g., PSR ¶¶ 50, 62, 164, 180;

2.  commandeered Baribeau's checkbook, PSR ¶ 49, 51, 184;

3.  directed corrupt contractors to use others as sub-contractors, e.g., PSR ¶ 54, 62, 92;

4.  directed SHA procurement officer Francis Maroney to use certain contractors, e.g., PSR ¶ 100, 110, 130

5.  directed contractors to throw in bogus bids, e.g., PSR ¶ 55, 133-37;

6.  handwrote the contractors' bid proposals, e.g., PSR ¶¶ 56, 72, 170;

7.  extracted the bribe payments from the contractors, e.g., PSR ¶¶ 52-53, 63, 67, 94, 140-43, 147, 152-55, 165-167, 171, 175, 185;

8.  rigged the bids by obtaining bids from contractors in advance of the bid-openings, e.g., PSR ¶¶ 69, 81; and

9.    orchestrated Joseph DeCaro's longtime looting of SHA's coin-operated laundry facilities, PSR ¶¶ 222-25.[1]

For example, it was the defendant who assisted corrupt contractor Nicholas Katsounakis by preparing his bids, handwriting his forms, providing him with estimates for job costs, and preparing his monthly bills. Testimony of Nicholas Katsounakis, T. 356-57, 374. It was the defendant who monitored Katsounakis's kickback debt, presenting him with a ledger detailing the $717,000 in kickbacks that Katsounakis owed. T. 383-84. It was the defendant who bluntly demanded that Katsounakis pay the bribes or lose his SHA payments: "He said to write all the F'ing checks or you're not getting your next requisition." T. 458. It was the defendant who forced Katsounakis to write checks totaling approximately $190,000 of bribes in a 24-hour period. T. 466-67.

In addition, it was the defendant who muzzled SHA's modernization coordinator, Wallace Kisiel, by crudely directing him to "shut the fuck up and mind his own business" after Kisiel attempted to supervise the work of corrupt contractor Peter Davis. Testimony of Wallace Kisiel, T. 1100. By contrast, the defendant

---

[1]  The defendant even went so far as to extract a bribe from Gary Baribeau to pay for a coin-wrapping machine, which the defendant kept in his office, so that he could more efficiently count and keep the quarters skimmed by DeCaro. See Racketeering Act 19 (G & R Associates, Inc. Check No. 848 for $1,864.00)

directed Kisiel to "keep an eye" on contractors who "did not play the game."  T. 1092-93.

The defendant also instructed SHA's project architect, James Bright, that he and Asselin, Sr. would review and sign Davis's requisitions, thereby assuring that Davis would be paid for work that he did not complete.  Testimony of James Bright, T. 1703.  The defendant also annotated Bright's punchlist for Davis's project, allocating much of Davis's work to be done by SHA itself, and directed SHA's maintenance workers to do the work for Davis. Testimony of James Bright, T. 1708-12; Testimony of George Williamson, T. 1833-34.

The defendant also directed his secretaries, Betsaida Torres and Virma Santiago, to forge signatures on SHA documents, to falsify work orders, and to use SHA time to perform private work for corrupt contractors, Christopher Asselin's political campaigns, and the Glendi Festival of the Greek Orthodox Church.  Testimony of Betsaida Torres, T. 2005-06, 1992-93, 2000-01, 2008-10, 2011-12.  For example, the defendant directed Torres to spend more than a month's work, including overtime, on Christopher Asselin's political campaign.  Testimony of Betsaida Torres, T. 2009-10.  When these crimes faced discovery by the FBI, the defendant directed Torres and Santiago to lie to the FBI, delete from their hard drives any computer files of the illicit work, and conceal the computer discs containing these files.  T.  2013-15.

Consistent with his role as a primary architect of the racketeering enterprise and conspiracy, the defendant was also a primary beneficiary of the crimes. As specified below, the defendant lined his pockets with a highly conservative estimate of $243,991 in bribe payments directed to either him or his family members:[2]

1. <u>Racketeering Act 1</u>: G & R Associates, Inc. Check No. 532 for $950.00 on or about 07/08/96, for a spruce stockade fence at rental property owned by the defendant;

2. <u>Racketeering Act 10</u>: G & R Associates, Inc. Check No. 630 for $336.00 on or about 02/17/98, for new tires and a front end alignment on his father's Cadillac Fleetwood;

3. <u>Racketeering Act 16</u>: G & R Associates, Inc. Check No. 687 for $3,772.50 on or about 07/09/98, for personal computer equipment delivered to the defendant;

4. <u>Racketeering Act 18</u>: G & R Associates, Inc. Check No. 723 for $2,340.35 on or about 08/27/98,

---

[2] Notably, this total omits many unspecified cash payments, many substantial checks for items that were shared by the Sotirion and Asselin families, and many items that were procured by the defendant for the benefit of others. <u>See</u>, <u>e.g.</u>, Racketeering Acts 2, 9, 11, 21, 22, 23, 34, 45, 61, 65, 67, 68, 97, 130-33, 144-48, and 151-53.

Broilermaster Premium "P" Series and two Deluxe "D" Series Stainless Steel Grills for the defendant and Asselin, Sr.;

5.  Racketeering Act 19: G & R Associates, Inc. Check No. 726 for $255.15 on or about 09/08/98, for three yards of concrete at the defendant's residence;

6.  Racketeering Act 20: G & R Associates, Inc. Check No. 738 for $550.00 on or about 09/27/98, for Big E tickets delivered to the defendant;

7.  Racketeering Act 25: G & R Associates, Inc. Check No. 779 for $1,500.00 on or about 06/08/99, delivered to the defendant and cashed;

8.  Racketeering Act 29: G & R Associates, Inc. Check No. 789 for $6,750.00 on or about 07/26/99, for new residential roof and barn roof at the defendant's sister's residence;

9.  Racketeering Act 30: G & R Associates, Inc. Check No. 793 for $1,125.00 on or about 08/11/99, for pressure-treated decking, two storm windows, and a load of mulch installed at the defendant's rental property;

10. Racketeering Act 31: G & R Associates, Inc. Check No. 794 for $2,375.00 on or about 08/11/99, for

automotive work on the defendant's personal vehicles and his daughter's Ford Taurus;

11. <u>Racketeering Act 36</u>: G & R Associates, Inc. Check No. 824 for $1,000.00 on or about 10/01/99, for gas grill purchased by the defendant;

12. <u>Racketeering Act 39</u>: G & R Associates, Inc. Check No. 828 for $1,500.00 on or about 10/21/99, for check delivered to the defendant and cashed;

13. <u>Racketeering Act 40</u>: G & R Associates, Inc. Check No. 834 for $6,000.00 on or about 11/08/99, for check delivered to the defendant and cashed;

14. <u>Racketeering Act 41</u>: G & R Associates, Inc. Check No. 836 for $4,850.00 on or about 11/22/99, for cedar fence installed at the defendant's residence;

15. <u>Racketeering Act 43</u>: G & R Associates, Inc. Check No. 845 for $2,460.00 on or about 01/05/00, for Digital camera, a DVD player, and other pieces of electronic equipment received by the defendant;

16. <u>Racketeering Act 44</u>: G & R Associates, Inc. Check No. 847 for $2,130.00 on or about 01/14/00, for Reconditioned transmission and other automotive work on the personal vehicle of the defendant's daughter;

17. <u>Racketeering Act 46</u>: G & R Associates, Inc. Check No. 853 for $50,000.00 on or about 03/17/00, for

first installment of $100,000.00 payment to the defendant on behalf of his brother;

18. <u>Racketeering Act 50</u>: G & R Associates, Inc. Check No. 923 for $50,000.00 on or about 08/15/00, for Final installment of $100,000.00 payment to the defendant on behalf of his brother;

19. <u>Racketeering Act 53</u>: G & R Associates, Inc. Check No. 1014 for $800.00 on or about 11/15/00, delivered to the defendant and cashed;

20. <u>Racketeering Act 54</u>: G & R Associates, Inc. Check No. 1053 for $3,139.35 on or about 01/17/01, in part for 32" Sony television delivered to the defendant's residence;

21. <u>Racketeering Act 68</u>: G & R Associates, Inc. Check No. 1163 for $600.00 on or about 12/27/01, for 100 cinema movie tickets delivered to the defendant;

22. <u>Racketeering Act 71</u>: G & R Associates, Inc. Check No. 1169 for $1,870.00 on or about 01/08/02, for reconditioned transmission and other automotive work in the defendant's personal vehicle;

23. <u>Racketeering Act 72</u>: G & R Associates, Inc. Check No. 1187 for $1,725.00 on or about 02/15/02, for reconditioned transmission and other automotive work on the defendant's Cadillac Brougham;

24. Racketeering Act 74: G & R Associates, Inc. Check No. 1202 for $7,000.00 on or about 03/15/02, for survey work at the Whately residence of the defendant's sister;

25. Racketeering Act 82: $308.00 worth of free labor and materials on or about 03/25/99, for plumbing services for work done at the residence of the defendant's parents;

26. Racketeering Act 83: Manny's Plumbing & Heating, Inc./G & R Associates, Inc. Joint Venture Check No. 4855 for $8,015.27 on or about 06/26/99, for a black quartz Corian kitchen countertop installed at the defendant's residence;

27. Racketeering Act 84: Manny's Plumbing & Heating, Inc. payment of approximately $3,000.00 in or about the fall, 1999, for labor related to the kitchen remodeling at the defendant's residence;

28. Racketeering Act 90: $25,000.00 in cash paid to the defendant through a series of cash payments beginning in or about September, 2000;

29. Racketeering Act 91: $5,000.00 in cash paid to the defendant through a series of cash payments beginning in or about September, 2000;

11

30.   <u>Racketeering Act 96</u>: $1,678.16 worth of free plumbing materials and services on or about 08/01/01 at the defendant's rental property;

31.   <u>Racketeering Act 99</u>: $258.56 worth of free plumbing materials and services on or about 06/14/02 at the defendant's rental property;

32.   <u>Racketeering Acts 122</u>: Paul A. Bannick Co., Check No. 16062 to Paul A. Bannick for $100.00 on or about 04/11/96, for cash to the defendant;

33.   <u>Racketeering Act 123</u>: Paul A. Bannick Co., Check No. 16201 to Paul A. Bannick for $300.00 on or about 08/21/96, for cash to the defendant;

34.   <u>Racketeering Act 124</u>: Paul A. Bannick Co., Check No. 16243 to Paul A. Bannick for $100.00 on or about 10/03/96, for cash to the defendant;

35.   <u>Racketeering Act 125</u>: Paul A. Bannick Co., Check No. 16280 to Paul A. Bannick for $300.00 on or about 11/14/96, for cash to the defendant;

36.   <u>Racketeering Act 127</u>: Paul A. Bannick Co., Check No. 16366 to Paul A. Bannick for $100.00 on or about 01/28/97, for cash to the defendant;

37.   <u>Racketeering Act 129</u>: Paul A. Bannick Co. Check No. 17024 for $800.00 on or about 01/07/99, for partial

payment for an overhead door at the defendant's residence;

38. Racketeering Act 139: M & D Remodeling Check No. 2469 for $475.00 on or about 04/24/01, for landscaping work at the defendant's residence;

39. Racketeering Act 141: M & D Remodeling Check No. 2536 for $335.00 on or about 08/02/01, for landscaping work at the defendant's residence;

40. Racketeering Act 142: M & D Remodeling Check No. 2695 for $330.00 on or about 11/05/01, for landscaping work at the defendant's residence;

41. Racketeering Act 143: M & D Remodeling Check No. 2281 for $1,040.00 on or about 05/21/02, for landscaping work at the defendant's residence;

42. Racketeering Act 156: $660.17 worth of free electrical materials and service on or about 06/20/01 at the defendant's residence; and

43. Racketeering Act 165: SHA Check No. 015148 for $1,530.08 to Eastern Electronics, Inc. in partial payment for the installation of a new alarm system panel at the residence of the defendant's parents' residence; and

44. $47,000 in cash, see PSR ¶¶ 257-59.

13

Count 114.  In connection with the tax fraud charged in Count 114, on or about April 15, 2000, the defendant falsely filed his 1999 federal income tax return (Form 1040) by failing to report substantial additional income received from bribes, stolen vending machine quarters, and goods and/or services paid by Springfield Housing Authority.

B.   The Impact On Victims

The actual fraud and loss amounts specified for Counts 1 and 2 understate the seriousness of the offenses because some of the bribery, theft, and fraud could not be calculated with precision. For example, the estimates omit the costs associated with the diversion of SHA's employees George Williamson, Betsy Torres, Virma Santiago, and others.  Moreover, dollar figures simply do not reflect the true harm caused by the defendant.

As the SHA Board of Commissioners made clear in its Victim Impact Statement dated November 22, 2006 (the "Impact Statement"), "[m]any have been victimized and it will take a very long time to recover. . . . [t]he victim impacts have been severe."  Impact Statement, at 1, 7. As the Impact Statement demonstrates, the loss figure attributed to any one defendant simply cannot capture the full extent of the harm caused by the defendants' crimes.  The defendants' crimes "have broken that essential trust with tenants, vendors, federal and state funding sources, and the general public."

14

Id. at 2. Such damage to the public trust is, literally, incalculable.

As one concrete example of this intangible harm, SHA lost its classification as a high-performing agency, which in turn resulted in the loss of essential federal funds. Id. at 3. In order to regain this valuable status and bring the SHA back to even keel, SHA had to devote "[t]housands of hours of time." The Board attests that "[i]t would take a forensic accountant to put a true dollar value on the effort," which cost an estimated "hundreds of thousands of dollars in time and talent." Id. at 3. Moreover, when SHA fails to obtain funding because of its criminal past, "the victims are the seniors and the disabled individuals who are the intended beneficiary" of the funds. Id. at 4.

Further, as many of SHA's buildings are "nearing functional obsolesence," the cupidity of the defendant, who received numerous benefits to his private home, stands in stark relief. Id. at 5. In sum, as the SHA Board recognized, "the totality of the corruption is jaw-dropping." Id. at 6-7.

II.    The Defendant Merits The Maximum Guidelines Sentence

        A.    The Defendant Deserves A Four-Level Role Enhancement

The defendant's primary and overarching role in the conspiracy merits a four-level enhancement pursuant to Section 3B1.1(a)(4), rather than the three-level enhancement assessed by the PSR. The Guidelines explicitly recognize that "[t]here can, of course, be

more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. §3B1.1, Commentary, Application Note 4.

It is well-settled in the First Circuit that "the mere fact" that a defendant was "subordinate" to another does not preclude the defendant's enhancement as an organizer or leader. <u>United States v. Casas</u>, 356 F.3d 104, 129 (1st Cir. 2004). Instead, the Guidelines direct the Court to consider various factors in assessing role, including:

> the exercise of decision-making authority; the nature of participation in the commission of the offense; the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. §3B1.1, Commentary, Application Note 4. Thus, the Guidelines instruct that titles such as "kingpin" or "boss" -- just like Executive Director and Assistant Executive Director here -- are "not controlling." <u>Id.</u>

Application of the Guideline factors to the defendant's conduct demonstrates that the defendant warrants a 4-level increase based upon his leadership role, just like his partner Asselin, Sr. As set forth above, the defendant exercised significant decision-making authority over both contractors and SHA employees; orchestrated virtually every aspect racketeering enterprise; personally recruited

16

numerous corrupt contractors and personally directed SHA employees to engage in fraudulent and obstructive conduct; received an extraordinary share of bribes; and led the execution of the offense through the direct control of others.  See United States v. Olivier-Diaz, 13 F.3d. 1, 5 (1st Cir. 1993) (affirming leader or organizer role where, among other things, defendant recruited others, supervised the collection of debts, and oversaw the operations when two co-conspirators were in prison); United States v. May, 343 F.3d 1, 8 (1st Cir. 2003) (affirming leader or organizer role where defendant, among other things, recruited co-conspirators, received payment, and typically kept for himself a larger share of the proceeds than anyone except [his partner]."); United States v. Andujar, 49 F.3d 16, 25 (1st Cir. 1995) (affirming leadership role in spite of the fact that someone else was "running the show" because the defendant was the ultimate organizer's "personal contact or principal man . . . and in that sense he was the leader, a leader and organizer.").

     B.    The Defendant's Family Circumstances Do Not
           Warrant Departure Or A Non-Guidelines Sentence

Section 5H1.6 of the Sentencing Guidelines states that "[f]amily ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.6. The First Circuit only rarely affirms departures for exceptional family circumstances, such as when a defendant was so irreplacable that

incarceration would cause exceptional hardship to his family. United States v. Rosselli, 366 F.3d 58, 68 (1st Cir. 2004). In order to determine whether this limited circumstance exists, the district court must inquire as to whether there are "feasible alternatives of care that are relatively comparable to what the defendant provides." United States v. Pereira, 272 F.3d 76, 82 (1st Cir. 2001). As the First Circuit has recognized, "[a] defendant's incarceration will invariably cause hardship to his family," United States v. Louis, 300 F.3d 78, 82 (1st Cir. 2002), and "immense hardships" fall within the heartland of family circumstances that do not warrant departure. Pereira, 272 F.3d at 81 (collecting cases).

The First Circuit has disapproved departures in cases with family circumstances far more extraordinary than this defendant's. See United States v. Claudio, 44 F.3d 10, 16 (1st Cir. 1995) (affirming district court's denial of departure based upon defendant's need to care for 12-year old son suffering from neurological condition and learning disorder); United States v. Chestna, 962 F.2d 103, 107 (1st Cir. 1992) (holding departure was not warranted for defendant who was the single mother of four young children); United States v. Rushby, 936 F.2d 41, 42-43 (1st Cir. 1991) (holding that defendant's steady employment for ten years, status as main breadwinner for wife and two children, and aid to wife's grandmother "are simply not sufficient to invoke the exceptions implied by the word 'ordinary' in §5H1.6"); United States

v. Carr, 932 F.2d 67, 72-73 (1st Cir. 1991) (reversing departure where defendant and her husband both faced prison terms because defendant's mother could take care of their young child).

Consistent with these decisions from the First Circuit, this Court recently refused to grant a departure based upon far more deserving family circumstances. United States v. Naomi Watford, 05-30057-MAP (January 16, 2006). In Watford, the defendant was the primary caregiver for four young children (aged between 1 and 11) who were present during an armed home invasion, in which she was severely beaten. The defendant had proffered a detailed expert psychological evaluation which concluded that the defendant's imprisonment would have a "pronounced and deleterious effect" on the children, whose father had been recently incarcerated. Nonetheless, this Court held that the defendant's circumstances did not suffice to warrant a departure and sentenced her to three years in prison - one more year than the maximum guidelines sentence facing the instant defendant.

By contrast, the defendant here only vaguely claims that:

> His wife's illness caused him to be extremely protective of her throughout their marriage to the extent that here ability to perform the normal routine of maintaining work and household are affected. Mr. Sotirion's efforts to insulate his wife from stress now mean she requires a completely structured environment in order to live life alone. The difficulties associated with attempting to provide this structure are not ordinary aspects of most other lives.

Defendant's Sentencing Memorandum, at 6-7; see also PSR ¶ 318 (describing wife's prior treatment).

However, the defendant concedes that his three children are college graduates, gainfully employed, and reside locally in Springfield, Longmeadow, or Somerville, MA. Defendant's Sentencing Memorandum, at 1-2. Notably, none of his three children has any children themselves, and thus they are in a greater position to support the defendant's wife than if they had dependents of their own. PSR ¶ 315. In addition, two of the defendant's sisters live in Springfield, where they are also gainfully employed. Defendant's Sentencing Memorandum, at 1. Thus, at least five family members are available to assist the defendant's wife during his incarceration. Moreover, the stress that the defendant's wife will experienced from his incarceration, while unfortunate, is "simply not sufficient to invoke the exceptions implied by the word 'ordinary' in §5H1.6." Rushby, 936 F.2d at 42-43. Because the defendant is hardly irreplacable during the period of his incarceration, his request for a family circumstances departure should be denied.

C.   Nature And Circumstances Of The Offense

The nature and circumstances of the offense warrant a Guidelines sentence. As set forth above, the defendant not only committed, but orchestrated, an astonishing series of bribery, theft, and fraud. The defendant also took steps to conceal his

crimes, such as directing his employees to lie to the FBI, destroy evidence, and conceal evidence.

Given the seriousness of the underlying offenses, and the defendant's central role, the nature and circumstances of the offense require a Guidelines sentence. <u>See</u> 18 U.S.C. § 3553(a)(1).

D.    <u>History And Characteristics Of The Defendant</u>

The personal characteristics of the defendant weigh in favor of a Guidelines sentence. Unlike most defendants who come before this Court, the defendant has enjoyed a life of rare privilege and affluence. He was raised in "an emotionally and economically secure environment" in his family's home in Springfield, MA. PSR ¶ 306. The defendant's father was an orthopedic surgeon and the family enjoyed a summer home in Whately. <u>Id.</u>

He received a bachelor's degree from a local college, got married, and then purchase not one, but two, residences. PSR ¶¶ 313-16. He moved into his own home when he was 27 years old. PSR ¶ 315. The defendant has enjoyed excellent physical health, save for an old football injury to his knee, and has no history of mental health problems or substance abuse, PSR ¶¶ 317-19. As the defendant's sentencing letters attest, he is embraced by a broad network of family and friends who remain loyal and close in spite of the instant prosecution.

During the defendant's offenses, he was gainfully employed in a position of authority that yielded him a respectable income. In

addition to the defendant's residences, he also owns two vehicles and a boat and has a net worth of $911,907.  PSR ¶ 323.

In sum, the defendant's life reveals no extenuating circumstances that might have motivated him to commit his crimes. Instead, as an educated person of relative affluence, the defendant well knew right from wrong and had absolutely no financial need to commit the crime.  Thus, it appears that only his naked arrogance and greed motivated him to commit his crimes.

As a result, his personal circumstances aggravate, rather than mitigate, the seriousness of his crimes.  At the very least, his history and characteristics warrant a Guidelines sentence.  See 18 U.S.C. § 3553(a)(1).

E.    The Need for the Sentence Imposed

A Guidelines sentence is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).

Here, the defendant participated in offenses that ultimately harmed the SHA and its needy tenants, its contractors, and its administrators, and then demonstrated blatant disrespect for the law by attempting to obstruct the investigation into his crimes by directing his employees to lie, destroy evidence, and conceal evidence.

In this case, where the defendant participated in a series of crimes marked by naked greed and brazen disrespect for the law, only

22

a Guidelines sentence will promote "respect for the law" and "provide just punishment." 18 U.S.C. § 3553(a)(2)(A). Moreover, a Guidelines sentence would provide general deterrence for others similarly situated in society. See 18 U.S.C. § 3553(a)(2)(B).

The defendant claims that the Court should consider his "age as it relates to the decreased likelihood that he will commit crimes in the future." Defendant's Sentencing Memorandum, at 8. However, the Guidelines clearly stated that "Age (including youth) is not ordinarily relevant in determining whether a departure is warranted." U.S.S.G. §5H1.1 (Policy Statement). Although the Guideline contemplate a departure where a defendant is "elderly and infirm," the defendant here is in excellent health, still relatively young (aged 57), and does not rest on this ground.

The First Circuit has repeatedly rejected departures based upon age, even where a defendant is facing a far longer period of incarceration. See United States v. Jackson, 30 F.3d 199 (1st Cir. 1994) (rejecting departure from 27-year guidelines sentence for 40-year old defendant); United States v. Doe, 921 F.2d 340 (1st Cir. 1990) (affirming 30-year sentence on 50-year old defendant). As the First Circuit explained in Doe, "The Guidelines limit consideration of age in determining a sentence to 'when the offender is elderly and infirm. . . .'" Id. at 347.

Moreover, although the defendant's age may mean that, statistically, he is less likely than a younger person to commit

another crime, such statistics melt away in the face of the facts of this offense, where the defendant spent a great part of his many years at SHA engaged in crime.    Thus, the defendant's broad, pervasive, and chronic misconduct suggests that his age does not relate to his recidivist tendencies to justify a departure or non-Guidelines sentence.

    F.   <u>The Defendant's Advisory Guidelines Range</u>

The government respectfully submits that the PSR's Offense Level Computation should be corrected to state that the defendant's role in the offense merits a four-level enhancement.    PSR ¶ 282. This yields an combined offense level as follows:

|  | Level | Units |
|---|---|---|
| Group I Adjusted Offense Level: | 36 | 1 |
| Group II Adjusted Offense Level: | 16 | <u>0</u> |
| Total Number of Units: |  | 1 |
| Greatest of the AOLs: | 36 |  |
| Increase Per §3D1.4: | <u>+0</u> |  |
| Combined AOL: | 36 |  |
| Adjustment for Acceptance: | <u>-3</u> |  |
| <u>Total Offense Level</u>: | 33 |  |

Based upon Criminal History Category I, Offense Level 33 yields an Advisory Guidelines Range of 135-168 months.

G.    Restitution

As contemplated by Paragraph 6 of the Plea Agreement, the defendant has tendered a check in the amount of $178,750.00, representing his interests in his two residences and a time share, as payment of any restitution claim submitted by the SHA.

The Plea Agreement specifies that "[t]he transfer of assets for restitution set forth herein shall not satisfy or offset any fine, cost of imprisonment, or other penalty imposed upon Defendant, except as set forth in this paragraph, nor shall the transfer of assets for restitution be used to offset Defendant's tax liability or any other debt owed to the United States."  Plea Agreement, ¶ 6, at page 7 (emphasis added).  Thus, the defendant's tender of restitution does not offset any fine that the Court may impose.

H.    Fine

The government respectfully requests that the Court impose the maximum statutory fine for all three of the defendant's counts of conviction: $250,000 each for Counts One and Two, and $100,00.00 for Count 114, for a total of $600,000.00.  PSR ¶ 336.

The defendant's advisory guideline fine range is $17,500 to $175,000 or twice the value of the proceeds of the offense.  PSR ¶ 337; see also U.S.S.G. §5E1.2, Commentary, Application Notes 2 and 4; 18 U.S.C. § 3571(d) (authorizing a fine of "not more than the greater of twice the gross gain or twice the gross loss"); 18 U.S.C.

25

§ 1963(c)(authorizing a fine "not more than twice the gross profits or other proceeds").

Here, the defendant himself received, at a bare minimum, gross profits or gain of $243,991 for the direct benefit of himself or his family members. Notably, this amount omits: (a) many unspecified cash payments; (b) many substantial checks for items that were shared by the Sotirion and Asselin families hundreds of thousands of dollars in bribes; and (c) substantial payments that the defendant procured for solely other co-conspirators like Asselin, Sr. and his family. Thus, the amount of $243,991 is a highly conservative estimate of the defendant's gross gain or profit, and certainly understates the gross loss attributable to the defendant.[3]

Thus, the Court should impose a fine of $600,000.00. Such a fine signals to this defendant, as well as to others tempted to engage in corrupt behavior, that crime does not pay.

---

[3]    In its objections to the PSR, the government initially stated that the defendant should pay a fine of $487,982.00, amounting to twice its conservative estimate of his gross profit.

III. <u>Conclusion</u>

For the foregoing reasons, the Government respectfully asks that the Court impose the maximum Guidelines sentence of 168 months and the maximum statutory fine of $600,000.00.

Filed this 2nd day of February, 2006.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


    /s/ Steven H. Breslow
STEVEN H. BRESLOW
Assistant United States Attorney

<u>CERTIFICATE OF SERVICE</u>

Hampden,  ss.                          Springfield, Massachusetts
                                       February 2, 2007


        I, Steven H. Breslow, Assistant U.S. Attorney, do hereby
certify that I have served a copy of the foregoing by electronically
filing said motion to:

Vincent Bongiorni, Esq.
95 State Street, Suite 309
Springfield, MA 01103
Counsel for defendant Arthur Sotirion


                                /s/ Steven H. Breslow
                          _____
                          STEVEN H. BRESLOW
                          Assistant United States Attorney